CHARLIE STURGILL MOTOR CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent CHARLIE and CHRISTINE STURGILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Charlie Sturgill Motor Co. v. Commissioner
Docket Nos. 5304-71 and 5305-71
United States Tax Court
T.C. Memo 1973-281; 1973 Tax Ct. Memo LEXIS 8; 32 T.C.M. (CCH) 1336; T.C.M. (RIA) 73281; December 26, 1973, Filed. William R. Bagby, for the petitioners. *12 Christopher D. Rhodes, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in income taxes and additions to tax under section 6653(a), I.R.C. 1954, of petitioners for the years and in the amounts as follows: 2 Petitioner
Fiscal year ended August 31
Deficiency
Addition to tax under Sec. 6653(a), I.R.C. 1954
Charlie Sturgill Motor Co.
1963
$ 2,638.02
$ 181.16
1964
6,576.48
376.82
1965
9,699.00
531.21
1966
13,118.57
655.93
1967
6,707.77
335.39
Calendar Year
Charlie and Christine Sturgill
1963
3,744.48
1964
8,167.83
408.39
1965
26,118.01
1,305.90
1966
16,242.58
812.13
Some of the issues raised by the pleadings have been conceded by each of the parties, leaving for our decision the following: 1. (a) Whether expenditures of $8,811.43 and $11,043.83 by Charlie Sturgill Motor Co. on its garage during its fiscal years 1964 and 1965, respectively, are deductible in whole or in part under section 162, I.R.C. 1954, [1] as repairs or are capital expenditures and (b) whether $3,452.52 spent for blacktop by Charlie Sturgill Motor Co. in 1967 *13 is deductible as repairs under section 162 or is a capital expenditure. 2. (a) Whether the amounts deducted as charitable contributions by Charlie Sturgill Motor Co. (hereinafter referred to as Motor Co.) in each of the years here in 3 issue were in fact payments made on behalf of Charlie Sturgill (hereinafter referred to as Sturgill) and therefore nondeductible distributions to a stockholder-officer, and (b) whether $100 paid by Motor Co. to the University Century Club is a payment on behalf of Sturgill of an amount which is not deductible by either Motor Co. or Sturgill and therefore is income to Sturgill. 3. (a) Whether payments in each of the years here in issue by Motor Co. to restaurants and social clubs for fees incurred by Sturgill, a payment of $50 per month by Motor Co. to Sturgill, and payments of membership fees and dues by Motor Co. to several social clubs on behalf of Sturgill were deductible business expenses by Motor Co., and (b) if these payments were not properly deductible by Motor Co., did they constitute income to Sturgill as payments made by Motor Co. for his personal expenses. 4. *14 Whether payments by Motor Co. in its fiscal year 1966 of medical bills incurred by Charlie and Christine Sturgill were deductible pursuant to a qualified corporate accident and health plan under section 105, and if not, did these payments constitute income to the Sturgills when they were made in their calendar years 1965 and 1966. 4 5. (a) Whether Motor Co. properly deducted in its fiscal year 1966 as a worthless debt the unpaid balance of amounts it had advanced to its wholly owned subsidiary, Fairfax Rent-A-Car, over a period of approximately 5 years, and (b) the proper amount of the loss incurred by Motor Co. in its fiscal year 1966 due to the worthlessness of its stock in Fairfax Rent-A-Car when that company was liquidated. 6. Whether Motor Co. is entitled to depreciate a leasehold improvement of blacktopping over a 10-year period if it is not entitled to depreciate all the leasehold improvements made over the 5-year period of a lease of property by Motor Co. from Sturgill's son Don. 7. Whether Motor Co. is entitled to a demolition loss of $2,090.40 in its fiscal year 1966 because of the destruction of a fence. 8. Whether Motor Co. is entitled to deduct depreciation *15 on furniture and equipment for its fiscal year 1967 of $1,078 in addition to the depreciation deducted on its tax return for that year. 9. (a) Whether a payment of $7,600 by The Colony, Inc. (hereinafter referred to as Colony) to Sturgill who owned 50 percent of Colony's stock was taxable to Sturgill as a dividend, and (b) whether payments to 5 Sturgill by Colony of $228 in 1964 and $731.50 in 1965 are taxable to Sturgill as dividends. 10. Whether the amount of $32,800 paid to Sturgill by the State of Kentucky in 1964 in connection with the condemnation of certain farmland owned by Colony was for damages to improvements he had placed on Colony's land or was a payment to avoid litigation includable in his taxable income. 11. Whether Sturgill received a dividend from Colony in 1967 because of Colony's, in effect, paying part of the purchase price of land deeded to Sturgill, and, if so, the amount of this dividend. 12. Whether Sturgill underreported his farm income for the years 1964, 1965, and 1966. 13. Whether Sturgill sustained a loss in 1963 on the sale of rental property on North Limestone Street in Lexington, Kentucky, and, if so, the amount of the loss sustained. *16 14. Whether Sturgill is entitled to deduct legal fees paid to attorneys representing him in proceedings in which the Commonwealth of Kentucky expropriated a portion of his land. 15. Whether a portion of the underpayment of taxes by Motor Co. was due to negligence or intentional disregard of rules and regulations. 6 16. Whether a portion of the underpayment of taxes by Sturgill was due to negligence or intenational disregard of rules and regulations. GENERAL FINDINGS OF FACT [2]
Some of the facts have been stipulated and they are so found. Charlie and Christine Sturgill are husband and wife, who at the time of the filing of their peition in this case resided in Lexington, Kentucky. Charlie Sturgill Motor Co. is a Kentucky corporation with its principal place of business at the time of the filing of its petition in this case at 129 East High Street, Lexington, Kentucky. Charlie and Christine Sturgill filed their Federal income tax returns for the calendar *17 years 1963, 1964, 1965, and 1966 with the district director of internal revenue at Louisville, Kentucky. Sturgill began business as a Pontiac automobile dealer in Lexington, Kentucky in 1934. In 1946 he incorporated his business in Kentucky as the Charlie Sturgill Motor Co. (Motor Co.). Sturgill has been 7 president and his wife has been the secretary of Motor Co. since the date of its incorporation. Together Charlie and Christine Sturgill own 680 of the 700 outstanding shares of Motor Co. Sturgill is a 50 percent stockholder in The Colony, Inc. (Colony), a farming and real estate corporation incorporated in 1946 in Kentucky. Colony's principal address is also at 129 East High Street in Lexington, Kentucky. The other 50 percent of Colony was owned by Bruce Isaacs until his death in 1966 and has thereafter been owned by the estate of Bruce Isaacs. The Fairfax Rent-A-Car Corporation (hereinafter, Fairfax) was organized in April 1958 as a wholly owned subsidiary of Motor Co. Fairfax engaged in the car and truck rental business until it was liquidated on August 31, 1966. 1(a) Deductibility of Expenditures on Garage Findings of Fact Motor Co. constructed a garage *18 during 1946 and 1947, at a time when materials and labor were scarce. By 1963, the garage was in a very poor condition and during its fiscal year 1963, Motor Co. expended $71,244.13 to restore and improve the garage. This entire amount was capitalized by Motor Co. on the basis of a useful life of 33 years. 8 During 1964 both the interior and exterior of the showroom area of the garage was damaged by water. Water leaked through the concrete block walls which became badly cracked and through the ceiling into the office area. Water also leaked through the roof of the canopy and the windows at the front of the showroom. The interior plastering of the showroom was damaged by the water. Plaster was loose on both the walls and ceiling. The acoustical tile was falling off the ceiling in the offices in some places and window sills and roof of the showroom rotted from the leakage. Some unsafe conditions existed in the garage building. The stairway in the showroom was unsafe and the floors of the showroom were supported by temporary posts. The terrazzo floor in the showroom was cracked and damaged by blows from the cars, as was a downspout. The concrete walks and ramps leading *19 into the showroom were cracked in places. Motor Co. employed an architect, A. H. Harmon, to examine the showroom area and recommend the work necessary to correct the unsafe conditions and water damage. The architect recommended that a copper roof replace the tar one, that new gutters and downspouts be installed, that steel window sills be installed in the showroom, and 9 that the exterior of the concrete block walls of the showroom be veneered with brick and waterproof mortar. He also recommended that work be done on the sidewalks and ramp leading into the showroom and that a block wall between the showroom and the remainder of the garage be torn out and a partition rebuilt with copper flashing along the separating wall. The work was to change the style of the building from contemporary to colonial. Motor Co. employed a contracting firm to do the work on the exterior of the building in accordance with the recommendation of the architect and this work was completed in Motor Co.'s fiscal year ended August 31, 1964. Motor Co. paid the contracting firm $16,138.73 for the work on the exterior of the building. Motor Co. capitalized $10,528.73 of this amount and deducted $5,610.00 *20 of the amount as repairs and also deducted $270 paid to the architect as repairs. The work on the interior of the building was begun in Motor Co.'s fiscal year 1964 and completed in its fiscal year 1965. This work consisted of work on the terrazzo floors, repairing damaged acoustical ceiling tile and installing ceiling tile in the office areas where there had previously been no tile, electrical work on wiring and fixtures damaged by water and the installation of new electrical wiring, repairing lathing and 10 plastering of water-damaged interior walls and ceilings in the showroom, and rebuilding the unsafe staircase. Of the total amount expended on this interior work, Motor Co. charged $5,494.43 to its capital account and deducted the balance as repairs. The items of interior work covered in the repair deductions and the amount deducted in each of its fiscal years 1964 and 1965 for these items are as follows: Fiscal Year 1964 Date paid
Payee
Work done
Amount
10/10/63
Don Crawford Elec.
Wiring
$ 635.81
5/25/64
Don Crawford Elec.
Wiring
232.95
8/18/64
Cecil Harp, Eng.
350.00
8/26/64
L. Standafer
Ceiling work
350.00
8/31/64
Eugene Yount
Ceiling work
438.00
8/31/64
Martina Bros.
Flooring
924.67
Total
$2,931.43
Fiscal Year 1965
Date paid
Payee
Work done
Amount
10/14/64
Martina Bros.
Flooring
$ 450.00
1/26/65
Fraley Bros. Tile
Ceiling work
304.00
2/16/65
Baker & McConaltry
156.15
2/23/65
Fraley Bros. Tile & W. J. Haertel Co.
Ceiling tile
160.00
3/9/65
Fraley Bros. Tile
Ceiling work
142.60
5/17/65
Don Crawford Elec.
Wiring
307.87
5/18/65
Allen Hicks Elec. Eng.
Installation of new electrical work
1,818.85
7/10/65
Don Crawford Elec.
Wiring
400.00
7/10/65
Eubank & Steele
417.90 [1]
8/7/65
Phillip Smith
Plastering
591.76
8/7/65
Layman Wrecking Co.
180.25
8/10/65
Don Crawford
New electrical installation
320.34
8/28/65
L. Standafer
897.96
8/31/65
Martina Bros.
New flooring and work on old floors
1,331.29
8/31/65
Don Crawford Elec.
Wiring
1,014.86
8/31/65
Charlie Smith
Painting
1,200.00
8/31/65
Charlie Smith
Painting
400.00
8/31/65
Martina Bros.
Work on old floors
650.00
8/31/65
Ind. Steel &
Staircase support
300.00
Total
$11,043.83 *21 Respondent in his notice of deficiency disallowed the entire $8,811.43 of work on the garage deducted by Motor Co. as repairs in its fiscal year 1964 and the entire $11,043.83 so deducted by it in its fiscal year 1965. Motor Co. now concedes that the following items of capital expenditures were improperly charged to repairs and should be capitalized: 12 Date paid
Payee
Amount
2/16/65
Baker & McConaltry
$ 156.15
5/18/65
Allen Hicks Elec. Eng.
1,818.85
8/17/65
Layman Wrecking Co.
180.25
8/28/65
L. Standafer
160.00
The $160 was part of a $897.96 payment to Standafer and was for installing acoustical ceiling in used car lot office. Opinion Respondent takes the position that the entire amount spent by Motor Co. for work on its garage and showroom was a capital expenditure, either because each item or work was part of a general renovation of the garage, I. M. Cowell, 18 B.T.A. 997 (1930), or because each and every item was a permanent improvement which added materially to the value of the property and *22 prolonged appreciably the life of the structure. Motor Co. contends that a substantial portion of the work is deductible repair expense because it merely restored the portion of the garage damaged by water to its condition prior to the damage and did not constitute a permanent improvement to the building. Section 1.162-4, Income Tax Regs., provides: Repairs. The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life but keep it in an ordinarily efficient 13 operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept. [Emphasis supplied.] We have long taken the position that in determining whether an item is deductible as a repair expense *23 or is a capital expenditure, we should consider the purpose for which an expenditure is made. Illinois Merchants Trust Co., Executor, 4 B.T.A. 103, 106 (1926). Although the legal guidelines are clear the question of whether an item is a deductible expenditure for a repair or a capital expenditure generally resolves itself into a factual determination. Having considered all the facts in the record before us, we find that all the expenditures by Motor Co. on the outside renovation of its building should be capitalized but that some of the expenses incurred in both its fiscal year 1964 and its fiscal year 1965 for rewiring, for work done on the interior walls of the showroom, for work on the terrazzo floor in the showroom, for replacing acoustical ceiling tile in its offices, and for step risers and staircase 14 were properly deductible as repairs. The evidence shows that much of this work was to repair water damage and to keep the property in an operating condition over the remainder of its 33-year probable useful life. Much of this work merely restored the building to an operating condition without appreciably prolonging the useful life of the building or materially *24 increasing the value of the property. Any repair will, of course, add some value, usefulness, or life to a building, "but the proper test is whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity as compared with the status of the asset prior to the condition necessitating the expenditure." Oberman Manufacturing Co., 47 T.C. 471, 483 (1967)
Respondent cites several cases which have treated the total expenditure incurred pursuant to a general plan of renovation or remodeling as capital in nature, even though some items might have been treated as repairs if they had been made separately, the leading case being I. M. Cowell, supra. We agree with respondent that the work on the exterior of the building was a general plan of renovation and therefore if there were some small repair items in this work, which is not clear from the record, these items should be capitalized as part of a general renovation expenditure. The veneering of the exterior concrete walls with brick changed the style of the building from contemporary 15 to colonial. The showroom window sills, roof, exterior entrance doors, and showroom windows *25 were complete and permanent replacements which increased materially the value of the garage and prolonged appreciably its useful life and are capital in nature. However, the interior work consisted appreciably of replastering, repainting, and mending floors, ceiling, and wiring because of water damage. Considering all the evidence, we have concluded that the following items in the amount indicated are properly deductible as repairs in the years indicated: Fiscal year ended August 31, 1964 Date of payment
Payee
Work done
Amount
5/25/64
Don Crawford Elec.
Wiring
$ 232.95
8/26/64
L. Standafer
Ceiling work
350.00
8/31/64
Eugene Yount
Ceiling work
438.00
8/31/64
Martina Bros.
Floor work
924.67
Total
$1,945.62
In our view the $270 paid to the architect was part of the overall renovation cost of the building and the evidence is insufficient to show that the payment on October 10, 1963, to Don Crawford Electric of $635.81 was not for an item which was capital in nature. 16 Fiscal year ended August 31, 1965 Date of payment
Payee
Work done
Amount
10/14/64
Martina Bros.
Floor work
$ 450.00
1/26/65
Fraley Bros.
Ceiling work
304.00
2/23/65
Fraley Bros. and W.J. Haertel Co.
Ceiling tile and step risers
160.00
3/9/65
Fraley Bros.
Ceiling work
142.60
5/17/65
Don Crawford Elec.
Wiring
307.87
7/10/65
Don Crawford Elec.
Wiring
400.00
8/7/65
Phillip Smith
Plastering
591.76
8/28/65
L. Standafer
Ceiling work
737.96
8/31/65
Don Crawford Elec.
Wiring
1,014.86
8/31/65
Charlie Smith
Painting
1,600.00
8/31/65
Martina Bros.
Floor work
650.00
8/31/65
Indiana Steel and
Staircase support
300.00
Total
$8,604.67
*26 There is some testimony that a part of the $1,331.29 paid to Martina Brothers on August 31, 1965 was for repair work to floors even though some portion of this was to install new floors. Considering the substantial amounts of other payments to Martina Brothers for floor repairs and the vagueness of the testimony, we conclude that no part of this payment is a deductible repair. We therefore sustain respondent's disallowance of repair deductions for work on Motor Co.'s garage except to the extent of $1,945.62 for its fiscal year 1964 and $8,604.67 for its fiscal year 1965. 17 (1) (b) Blacktop Findings of Fact In 1967 Motor Co. paid to Rodney Dennis and the Southern Supply Company $3,452.52 for work on a parking lot adjacent to its building. This work was listed as blacktopping and deducted by Motor Co. as a business expense for repairs. Respondent in his notice of deficiency disallowed this deduction and determined that the expenditure was for a capital improvement and should be capitalized. Opinion Motor Co. offered no evidence to show that the blacktopping of the parking lot was not a capital improvement. We find therefore that Motor Co. has not carried its burden *27 of proof to show that the expense is deductible as a repair and sustain respondent's determination that the amount of this expenditure must be capitalized. (2) Claimed Deduction for Charitable Contributions Findings of Fact Motor Co. made payments during its fiscal years ending August 31, 1963 through 1967 to Christ Church and Shakertown, Inc., as follows: 18 1963
1964
1965
1966
1967
Christ Church
$765.00
$970.00
$1,400.00
$1,385.00
$1,365.00
Shakertown, Inc.
746.76
600.00
900.00
700.00
Christ Church and Shakertown, Inc. (a restored 18th century village which is a national historic site not operated for profit) are charitable organizations qualifying under section 170(c)(2) as organizations to which a deductible contribution may be made. Sturgill is a member of Christ Church. He and his wife have made personal contributions of money to the church during the years 1963 through 1967. Sturgill also made pledges to the church which were recorded by the church bookkeeper in her ledger sheets in his name. Pledges for contributions to Shakertown, Inc., were also made in the name of Sturgill during the years 1963 through 1967. *28 Sturgill is a life charter member of that organization. Motor Co. deducted the payments made to Christ Church and Shakertown, Inc., as charitable contributions. Respondent in his notice of deficiency disallowed these claimed deductions on the ground that the payments were made because of, and for the benefit of, Sturgill individually and should be treated as dividends to him with deductions in the same amount allowed to him as personal charitable contributions. In 1966 Motor Co. paid $100 to the University of Kentucky Century Club. After receipt of this payment, 19 Sturgill was listed and considered a member of the University of Kentucky Century Club, an alumni organization which is associated with the University of Kentucky and as such does not qualify under section 170(c)(2) as an organization to which contributions are deductible. Sturgill considered the $100 payment to be for use in constructing an alumni building. Motor Co. deducted the $100 as a charitable contribution Respondent in his notice of deficiency disallowed this claimed deduction with the explanation that the payment was on behalf of Sturgill. Respondent did not allow Sturgill a deduction for the $100 *29 as properly deductible as a charitable contribution. Opinion Respondent takes the position that Sturgill, the 97 percent owner of Motor Co., executed the pledge cards to Christ Church and Shakertown in his own name and that when Motor Co. contributed money to these charities it paid Sturgill's previously incurred and individual obligations, thereby in effect paying a divident to Sturgill. Motor Co. contends that the pledges were made by Sturgill, not as his personally but as agent for the corporation. The issue is purely factual. Within the 20 legally permitted limits a corporation is entitled to deduct charitable contributions which it makes. Where, as here, the corporation makes contributions to charitable organizations of which its major stockholder is a member, the facts should be carefully scrutinized to determine if, in fact, the contribution is that of the corporation or a payment by the corporation of the stockholder's contribution. The record in this case shows that Sturgill did in fact pledge the amounts of the contributions to Christ Church and Shakertown, Inc. In some circumstances contributions by a corporation to organizations such as Christ Church *30 and Shakertown, Inc., might, even though the pledge is made on its behalf, nevertheless be considered as contributions of the major stockholder, if the evidence justifies such a conclusion. In our opinion the evidence in this case does not justify such a conclusion. The nature of Motor Co.'s business and the fact that Sturgill and his wife both made personal contributions to Christ Church lead us to conclude that in this case the contributions were properly deductible by Motor Co. The amounts of these contributions were not dividend income to Sturgill and, of course, the amounts are not deductible by Sturgill as charitable contributions since they are properly deductible by Motor Co. 21 Neither Sturgill nor Motor Co. contends that the University of Kentucky Century Club is an exempt organization under section 170(c) (2). Therefore, the $100 paid on behalf of Sturgill by Motor Co. to the University of Kentucky Century Club is not deductible by either Sturgill or Motor Co. under section 170 unless it is deductible under the provisions of section 1.170-2(b) (3) (1), Income Tax Regs., which provides in part: A gift to an educational institution through an alumni association *31 * * * which acts simply as a fund-raising or collection agency through which gifts may be made currently to the institution, is a gift to the educational organization if the entire gift inures to its benefit, * * * However, contributions to an alumni association for dues which entitle the member to benefits or privileges, or which are for the enhancement of noneducational and noncharitable interests are not deductible gifts to the educational institution. Cf. Estate of Philip R. Thayer, 24 T.C. 384 (1955). Sturgill testified that Motor Co.'s contribution was toward a fund for the construction of a new alumni building. Sturgill, as a result of the $100 contribution, is listed by the club as a member of the alumni association. On the basis of the facts in this record, we conclude that the $100 payment by Motor Co. to the University of Kentucky Century Club was a payment for the benefit of Sturgill and is to be treated as dividend income to him and not a deductible charitable 22 contribution by Motor Co. We further conclude that the record is insufficient to show that the $100 is a deductible contribution by Sturgill as distinguished from a payment for his membership *32 in the University of Kentucky Century Club with the privileges that go with membership in an alumni association. (3) Claimed Deduction for Business Promotion and Entertainment Expenses by Motor Co. Findings of fact During its fiscal years ended August 31, 1963 through 1967, Motor Co. deducted amounts for bills that Sturgill incurred at numerous clubs and restaurants, and for payments to a caterer and to the Fayette Liquor Store. Sturgill used the clubs and the restaurants for both personal and business entertainment and charged one-half the amounts spent at such restaurants and clubs to his personal account and one-half to the account of Motor Co. During its fiscal years 1963 through 1967 Motor Co. made payments to Sturgill of $50 a month and listed the payments in an account entitled, on its records, "Account No. 70, Travel and Entertainment." Motor Co. deducted these payments as a business expense. Neither Motor Co. nor Sturgill kept contemporaneous records or receipts as to the use by Sturgill of these payments of $50 a month. 23 During its fiscal years ending August 31, 1963 through 1967, Motor Co. paid one-half of the dues for Sturgill's membership in the Idle *33 Hour Country Club, Lexington Club, and Iroquois Hunt Club, all of which are social clubs. Motor Co. deducted these payments as business expenses for "dues and publications." The total amounts of expenses deducted by Motor Co. on account of payment of Sturgill's restaurant and club bills and the $50-per-month payments were $2,187.80, $1,435.37, $1,350.19, $1,377.11, and $2,276.99 for its fiscal years ended August 31, 1963, 1964, 1965, 1966, and 1967, respectively. The total amounts deducted as dues and publications by Motor Co. on account of payments of dues to clubs of which Sturgill was a member were $616.00, $319.02, $1,096.01, $1,403.09, and $1,295.75 for its fiscal years 1963, 1964, 1965, 1966, and 1967, respectively. In his notice of deficiency respondent disallowed the above amounts claimed by Motor Co. as part of its deductible travel and entertainment and dues and publications expenses with the following explanation: The deductions of $5,236.40, $2,826.29, $2,961.98, $3,660.92 and $3,063.05 claimed for travel and entertainment expenses for the taxable years ended August 31, 1963, August 31, 1964, August 31, 1965, August 31, 1966 and August 31, 1967, respectively, are *34 not allowed to the extent of $2,187.80, $1,435.37, $1,350.19, $1,377.11 and $2,276.99, respectively, because 24 it has not been established that any amounts in excess of $3,048.60, $1,390.92, $1,611.79, $2,283.81 and $786.06, respectively, represent ordinary and necessary business expenses or were expended for the purpose designated. * * * The deductions of $2,071.10, $1,668.21, $3,073.26, $2,279.77 and $2,793.96 claimed for dues and publications expenses for the taxable years ended August 31, 1963, August 31, 1964, August 31, 1965, August 31, 1966 and August 31, 1967, respectively, are not allowed to the extent of $616.00, $319.02, $1,096.01, $1,403.10 and $1,295.75, respectively, because it has not been established that any amounts in excess of $1,455.10, $1,349.19, $1,977.25, $876.67 and $1,498.21, respectively represent ordinary and necessary business expenses or were expended for the purpose designated. * * * Respondent in his notice of deficiency to Sturgill for the calendar years 1963, 1964, 1965, and 1966 increased his income by $1,952.84, $1,400.22, $1,354.65, and $1,437.63, respectively, which amounts he explained were personal travel and entertainment expenses *35 of Sturgill paid by Motor Co., and increased Sturgill's income in these years by $198.00, $550.22, $1,609.60 and $1,099.75, respectively, which he explained were dues and publications expenses of Sturgill paid by Motor Co. 25 Opinion Respondent takes the position that Motor Co. has not established that any of the payments made for bills incurred by Sturgill for dues to clubs of which Sturgill was a member, or the $50-a-month payments to Sturgill, were business related, and that the evidence relating to expenditures made after December 31, 1962, do not satisfy the substantiation requirements of section 274. [3]
*36 26 Motor Co. argues that since respondent did not specifically mention the application of section 274 to the disallowance of the deductions claimed by Motor Co. for 27 payment of bills incurred by Sturgill which it claimed were for entertainment expenses, no issue for the period after December 31, 1962, when section 274 would be applicable is properly before us as to whether the requirements of that section have been met. In our view respondent's statement in the notice of deficiency that Motor Co. has not shown that the payments were for the purpose designated is sufficient notice to Motor Co. that it has failed to comply with section 274. On the basis of the facts here, it is obvious that Motor Co. has not complied with the requirements of section 274. However, section 274 is a "disallowance provision," which operates to disallow expenses which have been shown to otherwise be allowable under the provisions of the Revenue Code. Wm. Andress, Jr., 51 T.C. 863, 866 (1969), affirmed per curiam 423 F.2d 679 (C.A. 5, 1970). Aside from any requirement of section 274, Motor Co. must show the business relationship of claimed entertainment expenses *37 in order to be entitled to deduct the amounts. The facts in this record are insufficient to show the business relationship of any of the amounts claimed to be deductible entertainment expenses. Motor Co.'s records reflect only that amounts were paid to clubs and restaurants on certain dates. There is no evidence to show that these expenditures were in any way related to Motor Co.'s business. Motor Co. paid $50 a 28 month to Sturgill, but has failed to show that the funds were used by Sturgill in the trade or business of Motor Co. There is no showing in this record that any of the restaurant and club entertaining by Sturgill was for customers, present or prospective, of Motor Co. and not for Sturgill's personal pleasure. See John A. Guglielmetti, 35 T.C. 668, 672-673 (1961). We therefore sustain respondent's disallowance of the deductions claimed by Motor Co. for these items. There is no evidence in this record to show that the payments of bills incurred by Sturgill, dues for Sturgill's membership in clubs and the $50-a-month payments to Sturgill were not payments of Sturgill's personal expenses or that these were payments which would be deductible expenses *38 by Sturgill. The inference from the record is that these payments were payments of Sturgill's personal expenses for his personal benefit. We therefore sustain respondent in his determination that these amounts were dividends constructively paid by Motor Co. to Sturgill, and are properly includable in his taxable income for the years in which they were paid. 29 (4) Medical Expenses Findings of fact Motor Co. paid for medical and dental services rendered to Charlie and Christine Sturgill during its fiscal year ending December 31, 1966, in the amount of $518.50. During that year the officers of Motor Co. were as follows: President - Charlie Sturgill Vice president - Don Sturgill Vice president and treasurer - Tom Sturgill Secretary - Christine Sturgill Tom and Don Sturgill are the sons of Charlie and Christine Sturgill. Neither of them was paid a salary as an officer of Motor Co. Don is an attorney and has represented Motor Co., and Tom is associated with the business of Motor Co. aside from being an officer. During its fiscal year ended August 31, 1966, Motor Co. paid for the cost of medical and dental services rendered for Charlie and Christine Sturgill *39 as follows: 30 Date
Payee
Amount
Services rendered for
9/10/65
Edward I. Scrivner (dental)
$ 55.00
Christine Sturgill
9/14/65
Edward I. Scrivner (dental)
150.00
Christine Sturgill
11/10/65
Edward I. Scrivner (dental)
200.00
Charlie Sturgill
9/15/65
Lexington Clinic (medical)
41.50
Charlie Sturgill
10/11/65
McKee-Klein Clinic (medical)
20.00
Charlie Sturgill
3/14/66
Lexington Clinic (medical)
52.00
Charlie Sturgill
Total
$518.50
Motor Co.'s accountant advised the company in its fiscal year 1965 to adopt a plan for payment of employee medical expenses. No mention of such a plan appears in the minutes of the annual meeting of the board of directors at the end of Motor Co.'s 1965 fiscal year. The following resolution was adopted at the meeting of the board of directors of Motor Co. on September 19, 1966 with the explanation indicated: The minutes of the previous meeting were read, that of the annual meeting of 1965, and the question of the omission of a motion passed the previous year was raised. After discussion, it was concluded that the motion had passed the previous year, but had not been entered into the minutes of *40 the meeting, and therefore the motion was made and passed unanimously that the minutes of the 1965 Annual Directors Meeting be ammended [sic ] to include the following motion as passed: BE IT RESOLVED, that the company shall pay the expenses incurred by the President, Charles H. Sturgill, the Vice Presidents, Don S. Sturgill and Thomas C. Sturgill, and the Secretary, Christine S. Sturgill, for 31 medical care for their spouses and their dependents. This resolution shall be liberally construed in conformity with the provisions of section 105 of the Internal Revenue Code of 1954, and the Regulations issued thereunder. Medical expenses shall include all the items included in the medical expense deduction. Payments may be made direct to the person or organization furnishing the service or item or the above named officers and employees, their spouses or dependents may be reimbursed for any payments they have made of medical expenses Motor Co. deducted the expenditures totaling $518.50 paid for medical expenses for Charlie and Christine Sturgill on its income tax return for its fiscal year ended August 31, 1966. Respondent in his notice of deficiency to *41 Motor Co. disallowed these claimed deductions. Respondent, in his notice of deficiency to Charlie and Christine Sturgill, determined that they had received a constructive dividend of $466.50 in the calendar year 1965 and $52 in the calendar year 1966 because of the payment of their medical expenses by Motor Co. Opinion Motor Co. claims that it adopted a medical care plan in September 1965, even though the minutes of the board of directors meeting held in September 1965 make no reference to such a plan. Motor Co. argues that the adoption of such a medical care plan in September 1965 32 is supported by the evidence that its accountant at around that time advised Motor Co. to adopt such a plan, and the entries in the corporate books during 1965 reflect the adoption of such a plan at the beginning of Motor Co.'s fiscal year 1966. Motor Co. contends that the plan it adopted was "for employees" and qualified under section 105(b)[4] and that it was pursuant to this plan that it paid for bona fide medical expenses of Charlie and Christine Sturgill. Section 105 provides for the inclusion in 33 income of amounts received by a taxpayer through accident or health insurance, *42 except that there are excluded from income payments to an employee made by his employer to reimburse him for medical care expenses if the payments are made in accordance with an accident or health plan of the employer. Section 1.162-10(a), Income Tax Regs., [5] permits the corporation to deduct medical payments made for employees. Section 1.162-10(a) has been interpreted 34 to specifically provide for deductions of amounts paid pursuant to an employees' accident and health plan. *43 Respondent takes the position that no "employees' health plan," formal or informal, of Motor Co. was in existence prior to September 19, 1966. In the alternative, respondent contends that the "plan" was discriminatory in that it was designed to benefit only the stockholders of the corporation rather than "employees" and that the payments on behalf of the stockholders are dividends to them in accordance with our holding in Alan B. Larkin, 48 T.C. 629 (1967), affirmed 394 F.2d 494 (C.A. 1, 1968). From the evidence in the record we conclude that Motor Co. did adopt a medical payment plan in 1965 even though the plan was not recorded in writing until September 1966. The testimony by Motor Co.'s accountant and the bookkeeping entries in that year, as well as the minutes of the September 19, 1966 board of directors meeting, indicate that such a plan was adopted by Motor Co. in late 1965 and was in force during the taxable year in issue. Cf. John C. Lang, 41 T.C. 352 (1963). We must therefore determine whether Motor Co.'s medical plan qualifies under section 105(b). "The 35 touchstone of section 105(b) is that the genesis of a medical *44 benefits plan must be a purpose to benefit "employees' as against other persons or classes of persons." Alan B. Larkin, supra, at 635.A plan which only covered those employees who owned stock has been held not to qualify. Samuel Levine, 50 T.C. 422 (1968). Similarly, where a plan provided coverage only for those employees which the officers of the corporation, at their discretion, might select. Alan B. Larkin, supra.At the same time there is no indication that a medical plan should fail to qualify merely because it does not cover all employees.[6] Nor do the statutes or the regulations specifically deny the existence of a bona fide plan simply because the benefited employees are also the major shareholders if those persons who are covered by the plan form a class of employees which can be rationally segregated from all other employees on a criterion other than ownership of stock or positions as officers. Those persons who are covered by Motor Co.'s plan are only Charlie and Christine Sturgill and their two sons and 36 their families. Of the four persons covered, only Charlie and Christine are shown to devote a substantial amount of time *45 to the business of Motor Co. Don performs no services for Motor Co., except as a practicing lawyer and the record does not show the nature of the services performed by Tom. Although Tom and Don are officers of Motor Co., it is clear that Don is not an employee and it is not clear what work Tom did for Motor Co. Therefore, there is insufficient evidence in this record to show that Don and Tom, along with Charlie and Christine Sturgill, formed a distinct class of employees which could be rationally segregated from Motor Co.'s other employees so as to qualify for additional medical benefits under a "plan" for "employees." As we said in Samuel Levine, supra, at 427: there must be some rational basis other than ownership of the business to justify discrimination among employees; i.e., that the so-called sick pay in question must in fact represent bona fide sick pay for employees rather than distributions to stockholders. * * * [Emphasis supplied.] *46 Don and Tom were officers of Motor Co., but were not paid for their services, if any, as officers. However, the record is silent as to the services, if any, performed by Tom and Don as "employees." Therefore, on the basis of this record, we conclude that the plan covers persons other than "employees" and 37 that there is no rational basis shown for the class of employees covered by the plan. For these reasons, the plan was not one which qualified under section 105 and it therefore follows that payments made by Motor Co. of the medical bills of Charlie and Christine Sturgill were not made pursuant to a section 105 plan. While the fact that the amounts are not made pursuant to an employees' medical plan under section 105 requires that the amounts of these payments be included in the taxable income of Charlie and Christine Sturgill, it does not follow, as respondent contends, that these payments are not deductible by Motor Co. If the payments were in the nature of dividends to the Sturgills, they, of course, are not deductible by Motor Co. However, if the payments are in the nature of additional compensation to the Sturgills, they are, if reasonable in amount, deductible *47 by the corporation under section 162(a) as any other payment of compensation to an officer. American Foundry, 59 T.C. 231, 243 (1972). As we pointed out in the American Foundry case, even though the corporate resolution intended the medical payments to qualify as payments under a plan within the meaning of section 105, there is no reason why the payments may not constitute additional compensation if the resolution shows an intent to benefit the officers involved and its effect under State law is to provide 38 such additional compensation. The corporate resolution of September 19, 1966 (effective retroactively to September 1965) was in effect an offering to the Sturgills of contractual rights to medical benefits. This type of fringe benefit is a widely used method of additionally compensating key employees. The fringe benefit provided for in the resolution of the board of directors of Motor Co. is reasonable and within the power of the board of directors, Kentucky Rev. Stats. section 271A, 020. The payments pursuant to the resolution do not result in excessive compensation to the Sturgills. We therefore find that the amounts of these medical payments are additional *48 reasonable compensation to the Sturgills deductible by Motor Co. as ordinary and necessary expenses under section 162(a). It follows, of course, that the amounts of the payments in each of the calendar years 1965 and 1966 are taxable to the Sturgills as additional compensation rather than as dividend income as determined by respondent. (5) Bad Debt Loss and Worthless Stock Findings of Fact Fairfax, in its operations of leasing cars and trucks, was intended not only to produce profits for itself, but also to provide business for its parent, 39 Motor Co., by purchasing Pontiacs from Motor Co. and having Motor Co. service its cars. Motor Co. chose to operate the rental car business through a subsidiary to avoid exposing itself to possible tort liability suits. When Fairfax commenced operations in April 1958, it had a contract with Greyhound Bus Lines for exclusive renting of cars under the Greyhound system, having the benefit of the Greyhound credit card. This agreement was terminated a little over a year later because Greyhound dropped its rent-a-car business. Shortly thereafter Fairfax became associated with the National Car Rental Company. This association lasted *49 about a year and thereafter Fairfax operated as an independent rent-a-car business. Fairfax never operated at a profit but reported losses on its Federal income tax returns for each year of its existence. Its receipts from rentals was about $21,000 in its fiscal year ended August 31, 1959, and in its fiscal years ending August 31, 1960, 1961, 1962, 1963, 1964, 1965, and 1966 were $17,500, $8,350, $9,500, $9,800, $3,400, $7,100, and $2,600, respectively. Fairfax paid no rent for its business office as it was operated from the offices of the Dominion Insurance Company in a building in Lexington, Kentucky owned by 40 Sturgill. The manager of the insurance company, which was also owned primarily by Sturgill, managed the "rent-a-car" business. The insurance on the cars used in the business was purchased by Fairfax through the Dominion Insurance Company from the Continental Casualty Company with premiums paid monthly on a per mileage basis. Cars and trucks, which were the sole operating assets in the business, were purchased from Motor Co. and generally were financed through a local bank. Motor Co. also made sales of parts and supplies to Fairfax and charged Fairfax fees for *50 servicing and storing cars. All the sales to Fairfax by Motor Co., with the exception of sales of cars which were paid for by cash received from bank loans, were entered in a "Fairfax accounts receivable" account in the books of Motor Co. Also entered in this account were cash advances which Motor Co. made to Fairfax when Fairfax needed operating funds, payments of bank loans which Motor Co. made for Fairfax, and payments to the manager of Fairfax which Motor Co. at times made. Payments on account by Fairfax to Motor Co. were also entered on Motor Co.'s books in this account, which also showed the balance due by Fairfax to Motor Co. Over the years from 1958 until the liquidation of Fairfax, the trend was an 41 increase in the balance due by Fairfax to Motor Co. The trend in payments by Fairfax to Motor Co. was a decrease. All sales of cars, parts, and other merchandise and services made by Motor Co. to Fairfax were reported in its income tax returns as sales for the years 1958 through 1966 and a profit reported from such sales and servicing. When Fairfax was liquidated on August 31, 1966, its only creditor, aside from the bank which held chattel mortgages on some of *51 its cars, was Motor Co. Fairfax transferred all its cars and trucks on hand to Motor Co. Motor Co. sold these cars and trucks and used the funds to pay the bank loans due by Fairfax for purchase of the cars and trucks. The balance on August 31, 1966, in the account on the books of Motor Co. for sales to and advances made to Fairfax was $18,571.66. Motor Co., on its Federal income tax return for its fiscal year 1966, deducted the $18,571.66 balance due it by Fairfax as a bad debt. On Schedule D of its fiscal year 1966 income tax return, Motor Co. listed the amount of $9,000 as a loss because of the worthlessness of its Fairfax stock. Respondent in his notice of deficiency to Motor Co. disallowed the entire Fairfax bad debt of $18,571.66 42 claimed by Motor Co. on the basis that the amount represented a capital contribution by Motor Co. to Fairfax and not an indebtedness. Respondent in his notice of deficiency made no adjustment to the $9,000 loss from worthless stock claimed by Motor Co., but by amended answer alleged that Motor Co.'s loss on the worthlessness of its Fairfax stock should be limited to the $5,000 which was shown on Fairfax's balance sheet as outstanding *52 capital stock. Motor Co. makes the alternative claim that if we sustain respondent's position that the $18,571.66 which it claimed as a bad debt loss was a contribution to capital, then its loss from worthless stock should be increased by this amount. Opinion Respondent's position is that the advances by Motor Co. to Fairfax, whether by way of cash, payment of Fairfax's obligation, or supplying Fairfax with cars, parts, and services, are capital contributions and not loans and that Motor Co. is not entitled to its claimed bad debt deduction. [7] Respondent contends that the 43 record shows that these advances were placed at the risk of the business without expectation of repayment. This issue is one of fact and its determination depends on the facts and circumstances *53 shown by this record. Gooding Amusement Co. v. Commissioner, 236 F.2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954). Martin M. Dittmar, 23 T.C. 789 (1955). Section 1.166-1(c), Income Tax Regs., states: (c) Bona fide debt required. Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166. The fact that a bad debt is not due at the time of deduction shall not of itself prevent its allowance under section 166. * * * Examining the record before us, we note that the advances by Motor Co. to Fairfax lack many normal indicia of a debt. While the absence of formal instruments of indebtedness, or provisions for regular repayment of principal and interest, and of security is a factor for our consideration, it is not necessarily controlling. Byerlite Corporation v. Williams, 286 F.2d 285, 290 (C.A. 6, 1960). When Motor Co. initially extended credit to Fairfax, the *54 circumstances of Fairfax were such that Motor Co. could reasonably expect to be repaid, as well as 44 reasonably expect to profit from the earnings of Fairfax and also from sales to Fairfax of Pontiac cars and the promotion of Pontiac cars by Fairfax. Initially Motor Co. received some repayments but as advances were made the balance built up and the repayments became less frequent. The prospects for Fairfax's success were relatively good during its initial period of operation while it was affiliated with Greyhound and then National Car Rental Company. After its association with National Car Rental Company ceased, Fairfax was unable to obtain an association with a national company. Thereafter it was unrealistic for Motor Co. to allow its open-account credit arrangement with Fairfax to continue with any reasonable expectation of repayment. The indications are that over the years the repayments by Fairfax to Motor Co. were equal to the advances by Motor Co. to Fairfax during the early years when the advances may have been made with some reasonable expectation of repayment. Fairfax's failure to obtain an affiliation with another national rental company after its association with *55 National Rental Car Company ceased was accompanied by decreased receipts and rentals were at such a low level that any reasonable anticipation of profit ceased. Motor Co. nevertheless allowed Fairfax's accounts receivable to progressively increase. After Motor Co. 45 could have no reasonable expectation of repayment of advances to Fairfax, it continued to advance money to Fairfax, increasingly paid its subsidiary's obligations to the bank, and, during some of its last years of operations, even paid the salary of its manager. With such a financial record, no outside lender of money would have made similar unsecured advances to Fairfax. Motor Co. contends that the existence of a bona fide business purpose in making the advances is the major factor leading to a determination that the funds were loans, relying on Byerlite Corporation v. Williams, supra.In that case the court emphasized the fact that the organization of the subsidiary was not motivated by the chance of profit from the subsidiary's business, but rather, was that the subsidiary was an integral and necessary instrument of the conduct of the business of the parent lender itself. That situation is very *56 different from the situation in this case. Motor Co.'s affiliate, Fairfax, conducted business for its own account, and not as a mere substitute for the parent lender. See Road Materials, Inc. v. Commissioner, 407 F.2d 1121, 1125 (C.A. 4, 1969), affirming, but remanding on another issue a Memorandum Opinion of this Court. Fairfax did promote Motor Co.'s business by 46 purchasing cars and service from Motor Co., but this aspect of its operations was at best peripheral to the central goal of profiting from auto rentals. The fact that Motor Co. operated through a subsidiary so as to avoid the great risk of tort liability does not override this distinction. The president of Motor Co. testified that "if the Fairfax had become prosperous, the Sturgill Motor Company would have been repaid." This testimony is further indication of Motor Co.'s intention that repayments of the advances made were to be contingent upon the success of Fairfax. From our analysis of the entire record, we conclude that those amounts advanced by Motor Co. to Fairfax which were unpaid on August 31, 1966, were contributions to the capital of Fairfax. [8]
*57 Motor Co.'s loss for the worthlessness of Fairfax's stock should be limited to the $5,000 value of the Fairfax stock as carried on Fairfax's balance sheet absent additional contributions by Motor Co. to Fairfax's capital. Motor 47 Co. contends that stock investment is not controlling and that respondent who has the burden of proof on this affirmative issue has no evidence to show that Fairfax had not made additional contributions of $4,000 to the capital of Fairfax. We agree with Motor Co. that respondent has failed to carry his burden of showing that Motor Co.'s total investment in the Fairfax stock was $5,000 at the date of liquidation of Fairfax. Therefore, we hold that Motor Co. is entitled to a loss of $9,000 plus the $18,571.66 which we have now determined was not loans but capital contributions by Motor Co. to Fairfax. Contributions to the capital of a corporation are proper additions to the donor's basis in his stock. See section 1016(a). Taylor v. Commissioner, 298 F.2d 198 (C.A. 4, 1962), affirming a Memorandum Opinion of this Court, and George Whitney, 8 T.C. 1019 (1947), affirmed 169 F.2d 562 (C.A. 2, 1948). In fact, respondent *58 apparently concedes that if we hold as we have that the $18,571.66 constituted a contribution by Motor Co. to Fairfax's capital, Motor Co. is entitled to consider this amount as additional investment in the Fairfax stock for the purpose of determining its loss from the worthlessness of the Fairfax stock. 48 (6) Depreciation on Leasehold Improvements Findings of Fact Prior to 1964, Sturgill suggested to his son Don that Don should purchase the vacant property adjacent to the property of Motor Co. Don purchased this property and Motor Co. leased the property from Don, with the approval of the Pontiac Motor Company, for a period of 5 years. The 5-year limitation coincided with the running of Motor Co.'s current dealership contract with Pontiac. During its fiscal years 1964 through 1967, Motor Co. constructed improvements costing $29,521.09 on the leased property and depreciated these improvements over the remaining life of the lease rather than the useful life of the improvements. The following schedule shows the date of acquisition, the cost, the reported life, and depreciation taken by Motor Co. for its fiscal years 1964 through 1967 on the improvements made on the real *59 estate: Date acquired
Cost
Motor Co.'s reported life
Fiscal year ended
Depreciation deducted on return
1964
$17,059.10
5 yrs. - 4 mos.
8/31/65
$1,137
1965-66
8,887.10
4 yrs.
8/31/66
5,633
1967
3,574.89
3 yrs. - 6 mos.
8/31/67
6,228
The amount of $7,178.75 of the cost of improvements in 1966 was for blacktopping the lot and $820 of the cost of improvements in 1967 was for blacktopping. 49 Respondent in his notice of deficiency to Motor Co. determined the composite life of the above improvements to be as follows: Years of improvements
Determined life
1964
20 years
1965-66
19 years
1967
18 years
Respondent recomputed Motor Co.'s allowable depreciation on the basis of the above useful lives and disallowed the additional amount claimed by Motor Co. for depreciation on these improvements to the extent it exceeded the depreciation determined on the longer useful lives. Opinion Even though Motor Co. depreciated the improvements on the parking lot it leased from Don over the 5-year life of the lease purportedly under section 178, on brief it, in effect, concedes that this is in error because Don is the son *60 of Charlie and Christine Sturgill, who owned 680 of the 700 shares of stock of Motor Co. As petitioners now concede, it is clear that under the provisions of section 178(b) (1) and (2)[9] Don and Motor Co 50 are related persons and the lease is to be treated as including a period of not less duration than the remaining useful life of the improvements. Motor Co., however, contends that the useful life of the blacktop should be 10 years instead of the 19 years for the 1966 blacktop improvements and 18 years for the 1967 blacktop improvements used by respondent. *61 Respondent's determination was on the basis of a composite useful life of all the improvements in each year. Motor Co. has not contended that use of this method is in error or introduced any evidence to show any error in respondent's determination. Because of this failure of proof by Motor Co., we sustain respondent's determination. 51 (7) Claimed Demolition Loss Findings of Fact In September or October of 1965 Motor Co. had a brick wall with a picket fence on top built along the party line between its leased used car lot and the adjoining land. This adjoining land was unpaved and was used by the YMCA for parking. The wall was built to protect the used cars from those parked on the YMCA lot and to keep dust from drifting over from the unpaved surface of the YMCA lot onto the used cars. The cost of the structure was $2,090.40. Of this amount, $1,284.40 was for the brick wall and $806 was for the redwood picket fence. Because of a need for additional space for its used cars, Motor Co. on December 15, 1965, purchased the YMCA land and shortly thereafter removed the brick wall. In an amended petition, Motor Co. alleged that it was entitled to a deduction of a *62 demolition loss for its fiscal year 1966 because of the removal of the brick wall and fence. Opinion Respondent contends that Motor Co. failed to prove that it is entitled to a deduction for the demolition loss because of the removal during its fiscal year 1966 of the brick wall and fence between its used car lot and the adjacent, newly acquired property. 52 Having considered the record before us, we agree with respondent that Motor Co. has failed to carry its burden of proof as to its alleged demolition loss. There is no adequate explanation of how the amount expended for the wall and fence was treated on the books of Motor Co. when the fence was built. The wall and fence were built and demolished in the same fiscal year. Although the fence does not appear as a depreciable item on the return of Motor Co. for its fiscal year 1966, there are miscellaneous deductions and a deduction for amortization on the return each of which is greater than the cost of the wall and fence. Therefore the record does not show that the cost of the fence and wall was not expensed in Motor Co.'s fiscal year 1966. Also, Motor Co. has not shown the amount of the salvage value from the materials *63 in the wall and fence which were removed. In summary, we find Motor Co. has not shown that it is entitled to any additional deduction for the demolition of the wall and fence. (8) Claimed Deduction for Additional Depreciation Findings of Fact Motor Co. purchased various items of furniture and equipment during the fiscal year 1967 costing $3,851.13. A certified public accountant prepared the Federal income 53 tax returns of Motor Co. for its fiscal year 1967. The items of office furniture and equipment purchased in its fiscal year 1967 were entered on the company's books. These items were used in the company's business. The items appear on the depreciation schedule on the accountant's workpapers, but no depreciation on these items was deducted on the Federal income tax return for the fiscal year 1967 filed by Motor Co. Motor Co. alleged in an amendment to petition that it was entitled to an increase in its deduction for depreciation on furniture and equipment of $1,078 for the fiscal year ended August 31, 1967, consisting of $770 first year "bonus" depreciation and $308 regular depreciation. Respondent does not question Motor Co.'s computation of the amount of depreciation *64 on the items listed. Opinion Respondent argues that Motor Co. has not shown that it is entitled to the increase in depreciation on furniture and equipment to which it claimed to be entitled by an allegation in an amended petition. Motor Co.'s books reflect $3,851.13 of additions to its Furniture and Fixtures Account for the fiscal year 1967. This figure includes two items purchased in the calendar year 1966. The accountant's worksheet includes 54 the purchases and shows his calculation of the depreciation deductions on these items in two entries. One is an entry of $770 representing first year "bonus" depreciation on these items and the other a $308 entry representing allowable depreciation on $3,081.13 (the total $3,851.13 cost less the $770 bonus). These amounts were not deducted on Motor Co.'s income tax return for its fiscal year 1967. On the basis of this evidence we find that Motor Co. has carried the burden of showing that it is entitled to the claimed increase in its deduction for depreciation. (9) Whether Sturgill Received from Colony in 1965 Dividend Income of $7,600 and Interest or Dividend Income of $228 in 1964 and $731.50 in 1965 Findings of Fact *65 Sturgill is a 50 percent shareholder in Colony. In 1946, Sturgill acquired a document labeled as a note from Colony. The face amount of the "note" was $7,600. This document was the subject of prior litigation before this Court. In that case, we held that the document in dispute did not represent a valid indebtedness of Colony to Sturgill and was instead a contribution by Sturgill to the capital of the corporation. Therefore, certain payments to Colony's stockholders including Sturgill in 1948, 1949, and 1950 55 were found not to be interest on indebtedness, but rather to be nondeductible distributions in the nature of dividends. Colony, Inc., 26 T.C. 30 (1956). This issue was not appealed, although other issues in the case were appealed to the United States Court of Appeals for the Sixth Circuit. Colony, Inc. v. Commissioner, 244 F.2d 75 (C.A. 6, 1957), and the United States Supreme Court, Colony, Inc. v. Commissioner, 357 U.S. 28 (1958). The petitioner Charlie Sturgill in the instant case is the same Charlie Sturgill mentioned in the Tax Court's Opinion in Colony, Inc., supra.
In April 1965, the Commonwealth of Kentucky condemned *66 a little over 26 acres of farmland owned by Colony. In the latter part of April 1965 an agreement was reached between the State and Colony that the State would pay $154,038 to Colony for the land taken and $111,162 for severance damages, since the condemnation involved the central tract of Colony's property which disrupted the operation of the farm. In May 1965 Colony received a check from the State for $265,200. The shareholders of Colony considered the possibility of liquidating the company. They consulted a law firm which recommended a 12-month liquidation plan. On April 29, 1965, Colony's board of directors and stockholders adopted by formal resolution a qualified 56 12-month "Complete Plan of Liquidation and Dissolution" and shortly thereafter Colony paid $7,600 to Sturgill and $7,600 to the estate of Bruce Isaacs, owner of the other 50 percent of Colony. In 1964 Colony paid Sturgill $228 and in 1965 paid him $731.50 in addition to the $7,600. In the early part of 1966 Colony reinvested $71,097 of the $154,038 in approximately 95 acres of farm property in Scott County and the balance in farm property in Banborn County, Kentucky and began operating those farms. In June *67 1965 Colony began investing part of the amount received as severance damage in building fences on the farm from which the 26-plus acres were taken and in doing other restoration work on the farm. Farming was continued on most of the remaining farm property. The only distributions to stockholders made by Colony after the condemnation of its property were the $7,600 to each stockholder made shortly after April 29, 1965, and the $731.50 payment made to Sturgill in 1965. Sturgill turned all the sums paid him by Colony in 1964 and 1965 over to the bank which held the document labeled, "note." Sturgill reported no income from the receipts from Colony and respondent in his notice of deficiency increased Sturgill's reported income for 1964 by $228 and for 1965 by the $7,600 and the $731.50. 57 Opinion Respondent's position is that all three payments to Sturgill by Colony are payments with respect to his stock, and, therefore, are dividend income to Sturgill. Respondent argues that the payments are dividends, since they are pro rate distributions made out of available earnings and profits and as dividends are taxable under the provisions of section 301 and section 316. [10]
*68 58 Sturgill asserts that he was a mere conduit in the transactions. He states that he immediately turned over all the money received from Colony to a bank to pay "interest" on, and to redeem the document labeled "note." In the prior decision of this Court with regard to the transaction between Sturgill and Colony, we held that payments of $7,600 each by Sturgill and the other 50 percent shareholder to Colony were contributions to capital, and not bona fide loans. [11] There has been no evidence introduced in this case to warrant a different holding. What Sturgill did subsequently with the document which we held was not a bona fide note does not transform it into an evidence of a corporate debt. Sturgill's dealing with the bank may well have been a personal pledge of part of his equity interest in Colony to the bank as security for a personal indebtedness. Under this view, if Colony did pay Sturgill's debt to the bank, this payment by the corporation of which he was a stockholder of his personal indebtedness would clearly be a divident to Sturgill. Jewell v. United States, 330 F.2d 761 (C.A. 9, 1964); Wall v. United States, 164 F.2d 462 (C.A. 4, *69 1947); Herbert Enoch, 57 T.C. 781 (1972); and Tirzah A. Cox, 56 T.C. 1270 (1971). 59 Sturgills' primary contention as to the $7,600 payment to him by Colony is that it was a distribution in liquidation. Sturgill contends that as a distribution in partial liquidation, the distribution is governed by section 346, [12] and he is not subject to income tax 60 thereon under section 301 by virtue of section 331. [13]
*70 Sturgill argues that the $7,600 is either the first payment in a series of distributions under section 346(a) (1), or an isolated payment representing a partial liquidation under section 346(a) (2). Under unusual circumstances, we have held that payments made pursuant to a formal plan of liquidation, which plan was never completed due to bona fide business reasons, would not be treated as taxable dividends, J. S. Alexander, 2 T.C. 917 (1943). However, where a corporation adopts a formal plan of liquidation but takes no steps to redeem its stock, nor to wind up its operations, nor to reduce its volume of business, the inference is strong that there was no valid intent to liquidate and that distributions made after adoption of the plan were in fact taxable 61 dividends. Cf. Robert W. Cleveland, 39 T.C. 657 (1963), affirmed 335 F.2d 473 (C.A. 3, 1964). The record before us does not indicate that Colony ever took steps to redeem all its stock.In fact, the record clearly indicates that there was never any intention that Colony redeem all its stock. Colony never curtailed its operations. In fact, it reinvested the amount paid it for the *71 land taken in the condemnation in other farmland and continued in a farming operation. The acreage of farmland acquired with the condemnation proceeds was greater than the acreage of farmland taken and the inference from the record is that Colony's operations were expanded rather than curtailed. Almost immediately after receiving the condemnation award, Colony began reinvesting portions of the severance damages in restoring the farm from which the property had been taken to a condition usable as a farm. On the basis of the facts, we find that the distribution does not qualify under section 346(a) (1) as one in a series of distributions of all of Colony's assets. Nor do we find that the distribution was pursuant to a partial liquidation under section 346(a) (2). Colony did not adopt a plan of partial liquidation but rather a plan of complete liquidation. Unless the 62 $7,600 paid to each stockholder reflected in the documents entitled, "note" is considered to be a payment in redemption of stock, Colony never redeemed any portion of its outstanding stock. Cf. Fowler Hosiery Co., 36 T.C. 201 (1955), affirmed 301 F.2d 394 (C.A. 7, 1962). Whether *72 the $7,600 payment is essentially equivalent to a dividend within the meaning of section 346(a) (2) requires a factual determination. One of the conditions in determining whether a transaction is a partial liquidation under section 346(a) (2) is to what extent, if any, the corporation has contracted its business operations. S. Rept. No. 1622, 83rd Cong., 2d Sess., p. 262 (1954). Section 1.346-1(a) (2), Income Tax Regs. A classic example of such a corporate contraction is found in the well-known and oft-cited case of Joseph W. Imler, 11 T.C. 836 (1948). In Imler, a fire destroyed the upper two floors of the building from which the business was conducted. The company decided not to rebuild the structure and instead, discontinued a portion of its activities primarily due to lack of storage space and scarcity of replacement materials. The company used the fire insurance proceeds to retire some of its stock. The Court found that the corporation contracted its business, and, having reduced the amount of capital necessary to its 63 opeations, paid out the excess in redemption of some of its stock. This was done for a real and legitimate business purpose, and was found *73 to be a bona fide partial liquidation. Sturgill has referred to the Imler case to support his assertion that Colony experienced a similar contraction of business when the State of Kentucky condemned a central tract of the corporation's farmland. We find that the Imler case is distinguishable for many reasons, two important ones being that Colony did not distribute the entire, or evan a substantial portion of the $265,200 condemnation award to its shareholders (it merely distributed $7,600 to each shareholder) and the lack of evidence that the corporation curtailed its farming operations to any degree whatsoever. In fact, Colony used the condemnation award to purchase additional farmland which purchase enabled it to maintain, if not expand, its operations. The record contains no evidence of special circumstances or of a bona fide business purpose for the distribution which would cause it to be characterized as anything other than an ordinary dividend. The net effect of the distribution was identical to that of a dividend. The distribution was pro rata, was not made for any apparent business purpose other than for the benefit of its shareholders, and did not alter in any 64 way *74 the relationship of the shareholders to the corporation. In addition, the exact amount of the distribution corresponds to the amount which each 50 percent shareholder had earlier advanced to Colony, which advances we held previously were capital contributions. This record indicates that the distribution was motivated simply by a desire to return this amount to the shareholders and was made with respect to each shareholder's stock ownership. As such, it is a taxable dividend to Sturgill to the extent of Colony's earnings and profits. Sturgill takes the position that the payments to him in 1964 of $228 and $731.50 in 1965 by Colony were interest charges on the $7,600 "note", and that he endorsed the checks for these sums over to the bank which held the "note." As we have pointed out, the so-called "note" is not a bona fide indebtedness of Colony to Sturgill. Colony has in effect paid the interest due on the personal obligation of Sturgill to the bank. These payments are income to Sturgill, but he, of course, is entitled to a deduction for his interest payments to the bank on his $7,600 debt to the bank. 65 (10) Whether Sturgill Received Income from the Condemnation Award
*75 Findings of Fact In 1960, the Highway Department of the State of Kentucky notified Colony and Charlie and Christine Sturgill of its intention to condemn certain property of which part was owned by the corporation (Parcel 1) and part was owned by the Sturgills (Parcels 1A and 1C). The Highway Department planned to use the land in connection with the construction of a new super highway circling Lexington. Sturgill negotiated with the State on behalf of all the parties. During the course of the negotiations, Sturgill realized that the construction through Colony farmland would destroy any potential that the land near the proposed road might have for subdividing for residential purposes, and he desired to salvage a portion of this land near where the heavy fill of the new road would be for a use other than subdivision. Sturgill accordingly requested the Highway Department to have stakes set along the proposed right-of-way, so that he could construct fences and move his thoroughbred horse operation to that area of Colony's farmland. In 1962 and 1963, Sturgill built two horse barns on the designated section of Colony's property at a total cost of $36,056. He also built a blacktop *76 road in 1963, which cost $3,971. These improvements were built and paid 66 for by Sturgill, individually, and placed on Colony's property with its permission. Sturgill had an agreement with Colony that he could personally use this portion of Colony's property and an option to purchase the property from Colony. During the years 1962 through 1965, Sturgill on his returns reported and was allowed depreciation of $6,230 for the two barns and depreciation of $2,171 on the road. Colony never claimed or reported any depreciation on the barns and road on its income tax returns. In early 1965 the Highway Department changed its plans and relocated the proposed exit and entrance ramps of the road. The revised plans placed the ramps within 17 feet of Sturgill's two barns. The ramps were to be above the barns and the road Sturgill had constructed, with drainage into the area which could cause flooding. The flooding in conjunction with the noise level from the traffic on the ramps would cause the barns to be unusable. In fact these barns have not been usable since the road was completed. Later in 1965, and as a result of 5 years of intense negotiations, the Kentucky Highway Department *77 condemned the 26.18 acres of Colony farmland needed for the new highway and paid Colony $154,038 for land and $111,162 as severance damages to the retained portion of Colony's farmland which was not condemned. The Highway Department also paid Sturgill 67 $32,800. Both these payments, among others, were reflected in the Department's Cost Breakdown and Pay Statement (hereinafter Pay Statement) as follows: Fee Simple R/W
Par. 1 - 26.18 Acres
$146,608
Par. 1A-1C - 28,749 sq. ft.
5,750
Permanent Easement
Par. 1 - 3 Acres
1,680
Damages
Par. 1
105,212
Par. 1A-1C
5,950
Sub-Total Consideration
$265,200
Added Par. 1 - $31,000; Par. 1A-1C - $1,800
32,800
Total Consideration
$298,000
The Pay Statement directed that the condemnation award be paid in two checks: $32,800 to Charles H. Sturgill and $265,200 to Colony, Inc. The Pay Statement labeled the $32,800 award as paid "in excess of appraisal" and referred to a memo of April 29, 1965, from R. A. Johnson, District Engineer, and by M. A. Anderson, Chief Right-of-Way Agent. This memo detailed the course of negotiations with Sturgill from April 9 to April 20, 1965, with regard to the four parcels *78 of land to be condemned. The memo, in pertinent part, reads as follows: Further he [Sturgill] contends that approximately two years ago he requested the District Seven Design Office to set right of way stakes in order that he could construct a board fence as he was to use a portion of the land to the east of the Relief Route for thoroughbred horses. The stakes were set, two barns were constructed 68 and paddocks were constructed in the immediate area. Approximately twenty-two months from the time Mr. Sturgill was told that the right of way line was fixed and would remain at the location shown on the plans, it was determined by the Department of Highways that an additional loop would have to be constructed to facilitate traffic movement on the interchange. The new right of way line is now within seventeen feet of the barns. Mr. Sturgill contends that the barns will be damaged and it would be difficult to retain insurance on his brood mares and he felt that his horse operation was damaged extensively. * * * I realize that some of Mr. Sturgill's points would not be permissive in court, however, such items are certainly recognized in the market and I feel that these *79 points do merit some consideration. * * * Due to the many complex problems and situations and the fact that in filing suit it would be necessary to file two suits instead of one, and in order to bring to a close a situation which has created an excessive cost in appraisal work, numerous days in negotiations, in addition to excessive time spent by attorneys over the past five years, and further, since the difference in the State's offer and the $323,000.00 asked by Mr. Sturgill does not represent a substantial amount, I am recommending that deeds be taken for the subject parcels and am requesting authorization to proceed in closing out these transactions. This memo was approved by Carl H. Bradley, Director of the Division of Right-of-Way, on April 30, 1965. Charles and Christine Sturgill did not include any part 69 of the $32,800 in the income as reported on their 1965 Federal income tax return. Respondent determined that the amount was ordinary income to the Sturgills as a payment to avoid litigation. Opinion Respondent contends that the payment to Sturgill represents payment to avoid litigation and is includable in his taxable income for 1965. The facts show that *80 Sturgill constructed certain improvements on land owned by Colony, and that the Highway Department's revised plans for a super highway through the Colony land destroyed the usefulness of these improvements. In addition to the anticipated noise level of traffic for the new road, the construction of the overpass, ramps, and interchange high above the ground level placed the barns and road in a hole, and the drainage of water from the highway caused flooding of the area during rainfalls. For these very reasons, the barns and road have not in fact been usable since the highway interchange was built. It is well established that in a condemnation proceeding in which only a portion of a taxpayer's land is condemned, there may be compensation paid for damages to the property not taken. Arch B. Johnston, 42 T.C. 880 (1964); L. A. Beeghley, 36 T.C. 154 (1961). For 70 tax purposes, such damages are not included in calculating the award for the involuntary taking of land, but rather the amount awarded as damages serves to reduce the cost basis of the retained property. If the severance award exceeds the adjusted basis of the retained property, the excess is *81 taxable gain. Where there is no clear formal allocation of a portion of the payment to damages, it is incumbent on the Court to make the factual determination of whether and to what extent payment was made for damages to remaining property from an examination of all the evidence including the condemnation proceedings, the contract between the parties and the negotiations by way of settlement. The record before us includes an official copy of the itemized Cost Breakdown and Pay Statement from the State of Kentucky. Although segregated from the awards for the land taken and damages allocated to the Colony's retained land, the payment of $31,000 with regard to parcel 1 is not specifically earmarked as damages for barns and the $1,800 payment with regard to parcel 1A-1C is not specifically identified as damage to blacktop. However, the obvious separate treatment of the payments, which is explained in the memorandum of April 29, 1965, and additionally confirmed by the 71 testimony of State Highway official Carl H. Bradley, indicates that the parties throughout the negotiations were very concerned with severance damages for Sturgill's improvements on Colony's land.The record amply *82 supports Sturgill's contention that the $31,000 was for severance damages to his barns and the $1,800 for severance damage to his blacktop. Having concluded that the evidence substantiates that $31,000 of the award to petitioner was for damages to Sturgill's barn and $1,800 was for damage to his blacktop, it follows that these amounts are income to Sturgill only to the extent that they exceed his basis in these improvements. The evidence shows the cost of the barns to be $36,056 and of the blacktop to be $3,971.Respondent in his notice of deficiency computed depreciation taken by Sturgill on the barns prior to 1965 at $6,230 and depreciation on the blacktop at $2,171. Sturgill has used these same figures on his return. Therefore, Sturgill's remaining basis in the bars in 1965 was $29,826 and his remaining basis in the blacktop was $1,800. Sturgill therefore had a gain in the severance damages paid with respect to the barns of $1,174 and no gain from the severance damage with respect to the blacktop. Sturgill's $1,174 gain is to be treated as a gain from the sale of the property. See Russell C. Smith, 59 T.C. 107, 113 (1972). 72 The parties agree that, as respondent *83 stated in his notice of deficiency to Sturgill, if the Court decides that Sturgill received the $32,800 from the Commonwealth of Kentucky in 1965 as severance damages to his barns and blacktop, Sturgill is not entitled to the depreciation of $2,739 on the barns and blacktop in 1965 as determined in that notice. (11) Whether Sturgill Received a Constructive Dividend from Colony from the Division of Costs of the Scott County Farm Findings of Fact After the condemnation by the State of Kentucky of certain land owned by the Sturgills and Colony, Sturgill investigated the possibility of reinvesting the proceeds of the condemnation award in like-kind property in order to defer recognition of gain under section 1033. Sturgill was particularly interested in a farm located in nearby Scott County, which farm was owned by the estate of Dewees W. Williams (hereinafter the Williams Estate). The Williams Estate was attempting to sell its Scott County farm in order to pay Federal estate and Kentucky inheritance taxes and had filed for and eventually received court permission to sell the property.The 356-acre farm was appraised for inheritance and estate tax purposes at $213,600. 73 Sturgill had initially contemplated purchasing the farm with his wife and his two sons, Don and Tom. In discussing the financing of the purchase, Sturgill and his family decided to include Colony, which had the $265,200 proceeds from the same condemnation proceeding available to reinvest. Sturgill discussed this idea with George Brown, a director and vice president of Colony since 1965, and Louis Cox, who was executor of the estate of Bruce Isaacs who had died in February 1966 owning 50 percent of Colony's stock. After seeing the farm, George Brown spoke with Louis Cox and they agreed that it would be advantageous to Colony to reinvest some of the money received from the State of Kentucky in this farm. At a meeting on June 29, 1966, of the board of directors of Colony, Sturgill disclosed the intentions of himself and his wife and of his two sons to purchase a part of the Scott County farm and recommended that the corporation also purchase 100 to 150 acres of the property. The board of directors adopted a resolution authorizing Sturgill to execute a purchase agreement on its behalf for 100 to 150 acres of the Scott County farm at $750 per acre, the per acre price of the farm including improvements that the executor of the Williams Estate had quoted Sturgill. The board further instructed 74 Sturgill to pay $40,000 as a downpayment thereon and to secure financing of the balance of the sale price through the Mutual Benefit Life Insurance Company (hereinafter Mutual). Sturgill accordingly made three applications for loans to Mutual, one for Colony, one for himself and his wife, and one for his two sons in order to finance the purchase of the Scott County farm. The three applications were filed with John Rogers, a state-wide appraiser in Kentucky who had worked for Mutual since 1932. John Rogers separately appraised the tract, consisting of 140 acres, which was to be purchased by Sturgill's two sons, the 116-acre tract to be purchased by Sturgill and his wife, and the 100-acre tract to be purchased by Colony. In his report he appraised the tracts as follows: Tract #1 Don & Tom Sturgill - Land: 140 acres at $700 per acre; Buildings - $3,000; Total value - $101,000. Tract #2 Charlie and Christine Sturgill - Land: 116 acres at $700 per acre; Building - $18,000; Total value - $99,200 Tract #3 The Colony, Inc.- Land: 100 acres at $700 per acre; Buildings - $0; Total value - $70,000 This appraisal was based on the fair market value of the property as farmland, for the purpose of making a 75 farm loan. The appraisal did not consider the value of the property for use as a residential subdivision or for use as anything other than a farm. After receiving assurance of obtaining financing, Sturgill entered into a contract on June 30, 1966, with the heirs of the Williams Estate, whereby he agreed to pay $750 per acre for the 356-acre farm, exact acreage to be determined by a survey to be arranged by Sturgill. Sturgill signed this contract both as an individual purchaser and on behalf of Colony. There was no mention in the contract of the proposed division of the farm into separate tracts. On December 20, 1966, the three tracts were surveyed and platted, and the farm was found to have a total of only 353.796 acres rather than 356 acres. The size of the tract which Colony was to receive was reduced to 94.796 acres, with the knowledge and approval of Cox and Borwn, and the tract Sturgill and his wife was to receive was increased to 119 acres. On December 27, 1966, Sturgill filed a request with the Scott County Circuit Court to have three deeds executed in accordance with the December 20 survey, which request was approved on December 28.The purchase of the Scott County farm was consummated and the three purchasers received deeds to their respective tracts on January 3, 1967. Colony paid $71,097 for 94.796 acres at $750 per 76 acre; and Charlie and Christine Sturgill paid $89,250 for 119 acres at $750 per acre. Charlie and Christine Sturgill reported no gain on this transaction on the 1966 Federal income tax return. Respondent in his notice of deficiency increased Sturgill's income as reported by $24,000 with the following explanation: It is also determined that you realized taxable income in the amount of $24,000 in 1966 upon the purchase of property in Scott County, Kentucky, for less than its value. Since no amount was reported therefor, your taxable income for the year 1966 is increased $24,000. Opinion If respondent is correct in his determination that Colony paid for part of the cost of Sturgill's land, it would follow that Sturgill received a constructive dividend under sections 301 and 316. Section 301(a) provides that a distribution of property by a corporation to a shareholder shall be treated as is provided in section 301(c). Section 301(c) provides that the portion of a distribution that is a dividend shall be included in gross income. Section 316 provides generally that any distribution of property made by a corporation to its shareholders out of earnings and profits is a dividend. Sturgill makes no contention that the earnings and profits of Colony were not 77 sufficient to permit of a dividend but contends that on the basis of this record we should conclude that Colony did not pay more for its land than its value and therefore bore no portion of the cost of Sturgill's land. Respondent's position is that Colony did pay more than the fair market value for the property it received and by so doing allowed its shareholder Sturgill to pay less than the fair market value for the property he received, thereby making a distribution of property to its shareholder Sturgill. Respondent offered the testimony of an appraiser, Ben H. Story, Jr., who made his appraisal in 1972 without actually going onto the property. Story accepted the overall $750 per acre price for the entire tract as the fair market value of the Scott County farm in 1966. He estimated, however, that the value of Colony's tract was $550 per acre, or a total of $52,150, and that petitioner's was worth approximately $1,000 per acre, or $118,697. [20] Story explained the reason for this large differential as being due to the difference in road frontage of the properties, difference in topography, and the fact that the Sturgill tract had 78 valuable improvements and the Colony tract had no improvements. *84 Story did not divide the estimated value of Sturgill's tract between buildings and land, because he did not go upon the property to examine closely and appraise the buildings. Sturgill offered the testimony of Rogers as an expert appraiser. Rogers stated that his valuation was more in the nature of an equitable division of the known cost of the entire Scott farm among the three parcels. However, he did offer support for his $700-an-acre appraisal.In our view, Rogers used a much more appropriate method of appraisal than did Story and had more support for his $700-an-acre value of the parcel bought by Colony than Story did for his $550-per-acre value. The total of the values placed on the three tracts by Rogers was $270,200 and of this amount approximately 26 percent was allocated to the Colony tract, 36.5 percent to the Sturgill tract and 37.5 percent to the tract acquired by Don and Tom. Applying these percentages to the $265,500 paid for the total farm, Colony's portion should have been $69,000, Sturgill's portion $97,000, and Don's and Tom's portion $99,500. *85 On the basis of $700 per acre for the unimproved portion 79 Colony acquired, Colony should have paid only $66,500 for its portion instead of $71,097. Generally accepting Roger's valuation of the property, we conclude that Colony paid $4,000 in excess of its proper proportion of the $265,500 paid for the whole Scott farm and Sturgill paid at least $9,000 less than his proper proportion of the $265,500 cost of the Scott farm. We therefore conclude that in effect Colony paid $4,000 of the cost of Sturgill's farm and that this amount is properly taxable to Sturgill as a dividend from Colony. (12) Underreporting of Farm Income Findings of Fact During the calendar years 1960 through 1966, Sturgill operated a horse boarding operation on his farm which was called the Fairfax Farm and was located around his residence near Lexington. Sturgill paid the costs of operating the Fairfax Farm by check rather than cash so as to facilitate accounting for business disbursements. Sturgill deposited all receipts from operation of the Fairfax Farm into a bank account in the name of Fairfax Farm. All deposits to that account were receipts from the horse farm operations. 80 The gross receipts *86 reported by Sturgill on his Federal income tax returns for the years 1964, 1965 and 1966 did not include all deposits to the Fairfax Farm bank account. Respondent determined that Sturgill understated his gross Fairfax Farm receipts during 1964, 1965 and 1966 by the amounts of $4,735, $3,153 and $1,000, respectively, which in each year was the excess of the deposits to the Fairfax Farm account and the receipts from this farming operation reported by Sturgill. Opinion Sturgill concedes that some of the deposits received for boarding horses at Fairfax Farm in each of the years 1964, 1965 and 1966 were not included as receipts in his income tax returns for those years. He argues that these receipts may have been accrued and included in income in previous years, but offers no proof to support this contention. Since Sturgill has continuously used the cash receipts and disbursements method of accounting in his Fairfax Farm operations, it seems unlikely that he would have reported income prior to receiving payment for services. We therefore sustain respondent's additions of those unreported receipts as set forth in the notice of deficiency to Sturgill's income as reported for each *87 of the years 1964, 1965 and 1966. 81 (13) Loss on Sale of Limestone Street Property Findings of Fact On May 4, 1962, Sturgill purchased improved real estate on N. Limestone Street, Lexington, Kentucky, at a cost of $15,000. Later in the year, Sturgill began remodeling the building on the lot. He leased the property for three months - December 1962, January 1963 and February 1963. On February 26, 1963, he contracted to sell the property for $43,000 and the deed was executed on March 1, 1963. At the time Sturgill contracted to sell the property he had spent $34,319.68 on remodeling costs. On his 1963 income tax return, Sturgill reported a loss of $1,212.34 on the sale of the N. Limestone Street property computed as follows: Acquired
Sold
Sales Price
Depreciation
Cost
Gain or Loss
Land and Building Remodeling Completed 11-62
11-62
3/1/63
$43,000
$171
$44,383.34
($1,212.34
Respondent in his notice of deficiency disallowed the claimed loss with the explanation that there was no substantiation of the cost of the improvements on the property which increased its basis to $44,383.34. By 82 amended petition Sturgill claimed *88 an increased loss on the sale of the property, alleging that his cost basis in the property was $50,205.02 with a resulting loss of $7,034.02. Opinion This issue is purely factual. After reviewing the evidence we have concluded that Sturgill's basis in this property at the time he sold it was $49,148.68, consisting of the $15,000 original cost plus $34,319.68 of improvements less $171 depreciation previously allowed. Therefore, Sturgill's loss on the property was $6,148.68. Of the basis claimed by Sturgill, the amount of $750.34 was not substantiated and the amount of $135 of improvements claimed to have been paid for on December 4, 1963, long after the sale of the property, has not been shown to be properly applicable to improvement to the property. (14) Claimed Deduction for Legal Fees Findings of Fact Sturgill and a partner, Widener, were co-owners of some land located near what is now New Circle Road in Lexington, Kentucky. This property was rented by them during 1963 and 1964 and Sturgill in his tax returns for each of these years reported rental income from the property. In anticipation of the construction 83 of New Circle Road, the Commonwealth of Kentucky *89 began condemnation proceedings to take a part of this land. Sturgill and Widener hired an attorney to represent them in a suit to contest the right of the State to condemn this property. Sturgill paid one-half of the legal fee, or $1,345.25, to the attorney in 1964. The effort to prevent the condemnation was unsuccessful and the property was taken by the Commonwealth subsequent to 1964. Sturgill, on his income tax return for 1964, deducted the $1,345.25 payment of the legal fee. Respondent in his notice of deficiency disallowed the deduction on the basis that the legal fee was a capital expenditure which should be added to the basis of the property. Opinion Sturgill takes the position that since the legal fee was paid to contest the right of the Commonwealth to take his property, the lawsuit was not one in defense of title. He further contends that payment of the legal fee did not add any rights or value to the property and that the fee is clearly a deductible expense under the authority of L. B. Reakirt, 29 B.T.A. 1296 (1934), affirmed 84 F.2d 996 (C.A. 6, 1936), and Blaine M. Madden, 57 T.C. 513 (1972) on appeal (C.A. 9, June 7, 1972). *90 84 Respondent has attempted to distinguish the case at bar from the holdings in Reakirt and Madden by contending that Sturgill's property was not used in his trade or business and that the legal fee paid in connection with resisting condemnation of nonbusiness property must be treated as a capital expenditure. The facts do not support respondent's contention. The evidence shows that Sturgill held this property for rent and reported rental income from the property in 1963 and 1964. There is some confusion in the record which stems from Sturgill's reference to the property as on the "Belt Line" in his tax returns, and the road is now known as New Circle Road. However, the facts show that the rental property referred to as the "Belt Line" property is the same property which was later condemned. The property which was taken even though Sturgill fought the condemnation was used by Sturgill in a business. It has long been recognized that the rental of property is a trade or business of a taxpayer even though his primary business may be in another field of endeavor. Anders I. Lagreide, 23 T.C. 508, 512 (1954), and cases there cited. Since the legal fee was paid *91 by Sturgill in contesting the right of the State of Kentucky to condemn property used in his trade or business, there is no 85 distinction in this case and the Madden case relied on by Sturgill. Respondent does not argue that the Madden case is not controlling or that we should reconsider our holding in that case if we found, as we have, that the property involved in the litigation was used in Sturgill's trade or business. We have therefore confined our consideration to the factual issue, and on that basis hold that Sturgill properly deducted the $1,345.25 payment of a legal fee. (15) Addition to Tax Asserted Respondent in his notice of deficiency to Motor Co. asserted an addition to tax under section 6653(a) based on negligence and intentional disregard of rules and regulations for each of the fiscal years ended August 31, 1963 through 1967. The facts show that Motor Co. disregarded the provisions of section 274 and the regulations thereunder in reporting travel and entertainment expenses and dues to social clubs, and that Motor Co. disregarded the provisions of section 178 in reporting depreciation on improvements on land leased from Sturgill's son. Also, from our findings *92 on the numerous other factual issues involved, it is apparent that Motor Co. was negligent or in intentional disregard of the rules and regulations in other respects in each of the years here in issue. On the basis of all the facts in 86 the record we sustain respondent's determination of an addition to Motor Co.'s tax for each of the fiscal years ended August 31, 1963 through 1967. (16) Addition to Tax Asserted against Sturgill Respondent in his notice of deficiency to Sturgill asserted an addition to tax under section 6653(a) based on negligence and intentional disregard of rules and regulations for the calendar years 1964, 1965, and 1966. The facts show that Sturgill underreported farm income for the years 1964 through 1966 and explained his failure to report the proper amounts as being due to the lost receipts and inadequate recordkeeping. This alone is sufficient to sustain respondent's determination of addition to tax under section 6653(a) for these years which are the only years involved in this issue. However, there are a number of other situations which are apparent from the facts set forth in our findings on the many factual issues involved in this case which *93 show either negligence or intentional disregard of rules and regulations by Sturgill for the calendar years 1964, 1965, and 1966. On the basis of the facts in this record, we sustain respondent's determination of addition to Sturgill's tax under section 6653(a) for each of the years 1964, 1965, and 1966. Decisions will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954. ↩
2. Because of the numerous factual issues in this case the findings of fact and opinion as to each issue will be separately set forth except for the few general findings applicable to all issues. ↩
1. This payment was apparently made in fiscal year 1964 but incorrectly charged on Motor Co.'s books in fiscal year 1965. ↩
3. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (a) Entertainment, Amusement, or Recreation. - (1) In General. - No deduction otherwise allowable under this chapter shall be allowed for any item - (A) Activity. - With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or (B) Facility. - With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business. (2) Special Rules. - For purposes of applying paragraph (1) - (A) Dues or fees to any social, athletic, or sporting club or organization shall be treated as items with respect to facilities. (b) An activity described in section 212 shall be treated as a trade or business. * * * (d) Substantiation Required. - No deduction shall be allowed - (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. ↩
4. SEC. 105. AMOUNTS RECEIVED UNDER ACCIDENT AND HEALTH PLANS. (a) Amounts Attributable to Employer Contributions. - Except as otherwise provided in this section, amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts (1) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (2) are paid by the employer. (b) Amounts Expended for Medical Care. - Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc. expenses) for any prior taxable year, gross income does not include amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include amounts referred to in subsection (a) if such amounts are paid, directly or indirectly, to the taxpayer to reimburse the taxpayer for expenses incurred by him for the medical care (as defined in section 213(e)) of the taxpayer, his spouse, and his dependents (as defined in section 152). * * * (e) Accident and Health Plans. - For purposes of this section and section 104 - (1) amounts received under an accident or health plan for employees, and (2) amounts received from a sickness and disability fund for employees maintained under the law of a State, a Territory, or the District of Columbia, shall be treated as amounts received through accident or health insurance. * * * ↩
5. Sec. 1.162-10 [Income Tax Regs.] Certain employee benefits. (a) In general. - Amounts paid or accrued by a taxpayer on account of injuries received by employees, and lump-sum amounts paid or accrued as compensation for injuries, are proper deductions as ordinary and necessary expenses. Such deductions are limited to the amount not compensated for by insurance or otherwise. Amounts paid or accrued within the taxable year for dismissal wages, unemployment benefits, guaranteed annual wages, vacations, or a sickness, accident, hospitalization, medical expense, recreational, welfare, or similar benefit plan, are deductible under section 162(a)↩ if they are ordinary and necessary expenses of the trade or business. * * * 6. We note in passing that the Senate version of section 105 which was in fact adopted eliminated the rigid nondiscrimination requirements on medical plans contained in the version passed by the House of Representatives. See H.R. 880, 83d Cong., 2d Sess.; sec. 105; H. Rept. No. 1337, 83d Cong., 2d Sess.; Comment, "Taxation of Employee Accident and Health Plans Before and Under the 1954 Code," 64 Yale L.J. 222↩ (1954). 7. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. ↩
8. Respondent has not raised the possible application of section 332 which provides nonrecognition of gain or loss by a parent corporation on receipt of property distributed in complete liquidation of a subsidiary. We therefore need not reach the question of whether our finding of additional capital contributions by Motor Co. to Fairfax might cause the transaction to come within the section 332 liquidation provision. ↩
9. Sec. 178(b) Related Lessee and Lessor. - (1) General rule. - If a lessee and lessor are related persons (as determined under paragraph (2)) at any time during the taxable year then, in determining the amount allowable to the lessee as a deduction for such taxable year for exhaustion, wear and tear, obsolescence, or amortization in respect of any building erected (or other improvement made) on the leased property, the lease shall be treated as including a period of not less duration than the remaining useful life of such improvement. (2) Related persons defined. - For purposes of paragraph (1), a lessor and lessee shall be considered to be related persons if - (A) the lessor and the lessee are members of an affiliated group (as defined in section 1504), or (B) the relationship between the lessor and lessee is one described in subsection (b) of section 267, except that, for purposes of this subparagraph, the phrase "80 percent or more" shall be substituted for the phrase "more than 50 percent" each place it appears in such subsection. For purposes of determining the ownership of stock in applying subparagraph (B), the rules of subsection (c) of section 267 shall apply, except that the family of an individual shall include only his spouse, ancestors, and lineal descendants. ↩
10. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General. - Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). * * * (c) Amount Taxable. - In the case of a distribution to which subsection (a) applies - (1) Amount constituting dividend. - That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. * * * SEC. 316. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * * ↩
11. Colony, Inc., 26 T.C. 30↩ (1956). 12. SEC. 346. PARTIAL LIQUIDATION DEFINED. (a) In General. - For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if - (1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to a plan; or (2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b). * * * (b) Termination of a Business. - A distribution shall be treated as a distribution described in subsection (a) (2) if the requirements of paragraphs (1) and (2) of this subsection are met. (1) The distribution is attributable to the corporation's ceasing to conduct, or consists of the assets of, a trade or business which has been actively conducted throughout the 5-year period immediately before the distribution, which trade or business was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part. (2) Immediately after the distribution the liquidating corporation is actively engaged in the conduct of a trade or business, which trade or business was actively conducted throughout the 5-year period ending on the date of the distribution and was not acquired by the corportion within such period in a transaction in which gain or loss was recognized in whole or in part. Whether or not a distribution meets the requirements of paragraphs (1) and (2) of this subsection shall be determined without regard to whether or not the distribution is pro rata with respect to all of the shareholders of the corporation. ↩
13. SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS. (a) General Rule. - (1) Complete liquidations. - Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock. (2) Partial liquidations. - Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock. (b) Nonapplication of Section 301. - Section 301 (relating to effects on shareholder of distributions of property) shall not apply to any distribution of property * * * in partial or complete liquidation. ↩
20. The tract owned by the Sturgill sons was estimated to be worth $675 per acre, or a total value of $94,500. ↩